IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

RAMONA HUTCHISON                       :

        Plaintiff                      :

        vs.                            :        Case No.  1:07-cv-01124-CCB

UDR, Inc.                              :

        Defendant                      :

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

    COMES NOW the Plaintiff, by and through counsel, and in opposition to the Defendant's

Motion for Summary Judgment, refers this Court to the attached Memorandum of Law and

accompanying Exhibits.

    WHEREFORE, Plaintiff respectfully requests that the Motion for Summary Judgment be

denied.

                                Respectfully submitted,

                                 */s/ Mitchell I. Batt*
                                Mitchell I. Batt, Fed Bar No. 12002
                                Sullivan, Talbott & Batt
                                77 S. Washington Street
                                Suite 304
                                Rockville, MD 20850
                                (301) 340-2450
                                *Attorney for Plaintiff*

## REQUEST FOR HEARING

The Plaintiff, through counsel, hereby requests a hearing on Defendant's Motion for Summary Judgment and Plaintiff's Opposition filed thereto.


*/s/ Mitchell I. Batt*
Mitchell I. Batt


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a copy of the foregoing Opposition was filed electronically and served electronically on counsel, this 3rd day of March, 2008 to:

Paul J. Kennedy, Esquire
Littler Mendelson, P.C.
1150 17th Street, N.W.
Suite 900
Washington, D.C.  20036

Juan C. Lopez-Campillo, Esquire
Littler Mendelson, P.C.
4767 New Broad Street
Orlando, FL 32814


*/s/ Mitchell I. Batt*
Mitchell I. Batt

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

RAMONA HUTCHISON                    :

          Plaintiff                    :

         vs.                    :          Case No.  1:07-cv-01124-CCB

UDR, Inc.                    :

         Defendant                    :

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.     SUMMARY OF THE CASE.

Ramona Hutchison ("Plaintiff") commenced employment with the Defendant on July 7, 2003 as a Community Director for the property known as The Greens at Cross Court Apartments in Easton, Maryland.  She reported directly to her District Manager, Henry Walker.  In October of 2005, the Plaintiff learned that she was pregnant and her management learned shortly thereafter of her pregnancy. The Plaintiff was due for delivery on June 22, 2006.  Over the next four months following her discovery of her pregnancy, the Plaintiff and Mr. Walker had several conversations about her pregnancy situation including her need for pregnancy leave of absence.  On the last occasion on which Mr. Walker inquired about the Plaintiff's due date, he indicated that he thought she was due in April and that he didn't think she was coming back after she had the baby because he was told that the Plaintiff wasn't coming back. The Plaintiff advised Mr. Walker that she was going to return to work but believed that he concluded she wasn't going to return following her leave. Coincidentally with these events, the Plaintiff's property

was being subjected to a financial audit in February of 2006.  On March 3, 2006, the Plaintiff was

terminated from employment.  The Defendant contends that the reason the Plaintiff was terminated from

employment was because of the financial audit results.  Plaintiff contends that she was terminated from

employment because of her pregnancy status and/or need for FMLA pregnancy leave, especially given

the fact that the Defendant did not believe that she was going to return from this leave.

Plaintiff brings claims under Title VII of the Civil Rights Act of 1964, as amended, for gender

discrimination based upon her pregnancy as well as under the Family and Medical Leave Act for

unlawful retaliation in the exercise of her FMLA rights.  Plaintiff also contends that she has sufficient

evidence to establish that her pregnancy status and/or need for FMLA pregnancy leave was the

determinative factor in the decision to terminate her from employment (pretext claim) or, at a minimum,

played a motivating role in the termination decision (mixed motive claim).

## II.      STANDARD OF REVIEW.

In ruling on a motion for summary judgment, one must draw all reasonable inferences in favor of the

non-moving party.  *Sterling Nat. Bank & Trust Co. of New York v. Fidelity Mfg. Investors,* 510

F.2d 870, 875 (2d Cir. 1975).  Furthermore, in evaluating the evidence within the context of a motion

for summary judgment, all inferences must be drawn in favor of the non-moving party.  *Webber v.*

*Towner Cty.,* 565 F.2d 1001, 1005 (8th Cir. 1977).  Summary judgment should seldom be used in

cases alleging employment discrimination and should only be applied in those rare instances where there

is no dispute of fact and there exists only one conclusion.  *Johnson v. Minnesota Historical Soc.,* 931

F.2d 1239, 1244 (8th Cir. 1991).

### III.    STATEMENT OF MATERIAL FACTS.[1]

### A.    General chronology of events.

Ramona Hutchison ("Plaintiff") commenced employment with the Defendant on July 7, 2003 as a Community Director for the property known as The Greens at Cross Court Apartments in Easton, Maryland (hereinafter "Cross Court").  Henry Walker was promoted to District Manager for the district in which Cross Court was located and became Plaintiff's immediate Supervisor in early 2005. (Walker depo, pages 13-19).  In October of 2005, the Plaintiff learned that she was pregnant. (Hutchison depo, page 104).  Mr. Walker learned about the pregnancy shortly thereafter.  (Hutchison depo, page 106).  After Mr. Walker learned of the Plaintiff's pregnancy, he reported it to both Theresa Barker (Mr. Walker's immediate Supervisor) and Louis Kovalsky (Ms. Barker's immediate Supervisor).  (Walker depo, pages 51-52).  Over the next four months, Mr. Walker made several inquiries with the Plaintiff about her pregnancy situation, asking her when she was going to be delivering. The Plaintiff responded that she was due for delivery on June 22, 2006.  (Hutchison depo, page 111). Plaintiff recalls that, on the last occasion in which Mr. Walker inquired about her due date, he indicated that he thought she was due in April and that he didn't think she was coming back after she had the baby because he was told that the Plaintiff wasn't coming back.  (Hutchison depo, pages 112-113).  In response, the Plaintiff told him that she did plan to come back to work after her delivery, that she couldn't afford to stay home, and that she loved her job.  (Hutchison depo, page 113).  The Plaintiff

---

[1]    Citations to each of the facts are to Plaintiff's Exhibits filed herein, Defendant's Exhibits which have been previously filed by Defendant, and deposition transcripts which has been previously filed by Defendant.

thought, however, that Mr. Walker believed that she wasn't going to come back to work following her leave. (Hutchison depo, page 253). Shortly thereafter, Plaintiff was terminated from her employment on March 3, 2006. (Plaintiff's Exhibit 1, Answer No. 2). The decision to terminate the Plaintiff was recommended by Mr. Walker to Ms. Barker who then recommended the termination to Mr. Kovalsky who authorized the termination along with Ms. Nellcine Ford, the Director of Employee Relations. (Plaintiff's Exhibit 1, Answer No. 1).

Prior to the Plaintiff's termination, she had received merit increases on January 2004, January 2005, and January 2006. (Plaintiff's Exhibit 1, Answer No. 5). Prior to her termination from employment, the Plaintiff had never been formerly disciplined or counseled with respect to her work performance. (Plaintiff's Exhibit 1, Answer No. 4). The Plaintiff's property was in the top 10 percent of the entire company with respect to quantitative measures such as occupancy and controllable net operating income. (Hutchison depo, page 120).[2] Prior to her termination, the Plaintiff received only positive feedback and Mr. Kovalsky would regularly brag about the Plaintiff at staff meetings. (Hutchison depo, page 119). Mr. Walker viewed the Plaintiff as being very passionate about her job. (Walker depo, page 39).

In discussions with Mr. Walker about her due date, the Plaintiff told him that she was going to need to take time off. (Hutchison depo, pages 109-110). In order to address this leave of absence, it

---

[2]

Mr. Walker testified that Plaintiff "fared pretty well" with respect to the quantitative benchmarks of occupancy, bad debt, expenses, and customer service. (Walker depo, pages 29-33). Mr. Walker gave this testimony without the benefit of looking at the actual monthly reports concerning these quantitative benchmarks. Plaintiff was denied discovery to these documents by ruling of this Court.

was Mr. Walker's plan to obtain a temporary worker to cover the phones so that Amy Flores (the

Plaintiff's Marketing Assistant) could take on more of the Plaintiff's responsibilities during the

pregnancy leave of absence.  (Walker depo, pages 54-55.  As of the time of Plaintiff's termination

from employment, Mr. Walker had neither communicated his plan to Theresa Barker or Louis

Kovalsky nor had he taken any specific actions to accomplish the plan.  (Walker depo, page 56).

After the Plaintiff was terminated from employment, her position was permanently filled by Diane

Nester who assumed responsibilities for The Greens at Cross Court along with her own current

property, The Greens at Schumaker Pond, until November 11, 2006 at which time Ms. Nester

devoted all of her energies to being the Community Director at Cross Court.  (Plaintiff's Exhibit 1,

Answer No. 3).[3]  Diane Nester was not pregnant at any time since she has assumed responsibilities for

Cross Court.  (Flores depo, page 38).

**B.     Summary of the Plaintiff's audit findings.**

A financial audit was conducted at Cross Court by Laurie Ward during the period of February

16 through March 3, 2006.  (Defendant's Exhibit C, bates no. 0005).  The Plaintiff had never been

audited before given that the last audit performed on the property, a full scope audit, was completed in

March of 2003.  (Defendant's Exhibit C, bates no. 0005).  The executive summary on the audit report,

written by Laurie Ward, stated as follows:

> "This audit disclosed significant issues that warrant the immediate attention of
> management.  These issues include cash management, integrity of occupancy and
> system data, management of fee income and utility billing, lease documentation, fair

[3]

The Plaintiff's termination obviously obviated the need to have to find temporary assistance to
cover her leave of absence.

housing concerns, including adherence to move-in promotions and credit/criminal screening practices. Other less significant control, compliance, or improvement issues were identified that also require the prompt attention of management." (Defendant's Exhibit C, bates no. 0005).

According to Henry Walker, the most significant issues which were identified in the audit were (1) inconsistent booking of late fees and failure to file in court; (2) criminal screening not run as required; (3) failure of the Plaintiff to sign off on the files and allowing the Assistant Community Director to sign off on the files; and (4) padding occupancy numbers. (Walker depo, pages 113-117). Each of these issues will be addressed in turn.

### (1)    Inconsistent booking of late fees and filing in court.

The Plaintiff admitted that there were times in which she used her judgment to determine whether or not to assess a late fee or file in court. However, the Plaintiff was told by Donna Girod, her former District Manager, that it was acceptable to use her discretion in assessing late fees. (Hutchison page 182). With respect to the one individual identified in the audit, the Plaintiff did not assess the fees because the individual was in the military and she had received a call from his superior officer that there was a delay in getting pay checks. (Hutchison depo, page 215).

### (2)    Criminal screening not run as required.

Plaintiff admits that, with respect to employees of corporate tenants (generally nurses), she did not run a credit or criminal check. The reason the Plaintiff did not do this was because this was the normal practice at the location. (Hutchison depo, pages 72-73; Flores depo, page 45). This practice made sense to the Plaintiff because the apartments were in the company name and the company had responsibility. (Hutchison depo, pages 76-77). With respect to the practice of running criminal/credit

6

checks for non-corporate tenants, the marketing associate (Amy Flores) had this responsibility and the Plaintiff only assumed it if Amy was not available. (Plaintiff's depo, pages 79-80). When the Plaintiff learned during the audit that the criminal checks were not always being done and that some tenants with "criminal denials" had moved in, she spoke with Mr. Walker, accepted that it was her responsibility, and admitted to her fault. (Hutchison depo, pages 142-143).

    **(3)**    **Failure of the Plaintiff to sign off on the files and allowing the Assistant Community Director to sign off on the files.**

Plaintiff admits that there were occasions in which she did not sign off on the files and allowed Ms. Flores to do so. However, it was Plaintiff's understanding that this practice was acceptable as long as Ms. Flores signed the Plaintiff's name and put Ms. Flores' initials next to it. (Hutchison depo, page 80). Plaintiff learned this from Brenda Dooley, a Community Director at another property. (Hutchison depo, page 80). Ms. Dooley was the Acting Community Director for Cross Court prior to the Plaintiff's employment. (Hutchison depo, page 81). Brenda Dooley provided training to the Plaintiff when she became employed as Community Director. (Flores depo, page 15). The Plaintiff never received a contrary instruction from Mr. Walker. (Hutchison depo, page 89).

    **(4)**    **Padding occupancy numbers.**

One of the findings of the audit was that Plaintiff was found to have "padded" her occupancy numbers. Padding occurs when a Community Director reports that apartments have been rented when in fact they are vacant.[4]

---

[4]

The Defendant's normal procedure was to have occupancy reported each Tuesday by way of a data upload. Accordingly, there was a great interest to have as many apartments "occupied" by Tuesday of each week before the upload occurred.

7

In order to "encourage" occupancy, the following hypothetical would be deemed to be an acceptable practice: applicant wants to move in on November 15 (Saturday); Community Director recommends that the lease be signed with a move-in date of November 10 (Monday); Community Director will then waive the five days of rent on the apartment so that the tenant is really only paying for the apartment from the actual move-in date – November 15.  (Walker depo, page 134).  Under this scenario, it was perfectly acceptable to report the apartment as occupied on Tuesday, November 11 even though the individual was not moving in until November 15.  (Walker depo, page 135).[5]  This practice is perfectly acceptable to the Defendant and is not considered to be occupancy padding. (Walker depo, pages 136-137).

The Plaintiff's understanding of what was acceptable to do is slightly different than that outlined by Mr. Walker.  The District Managers were in a race to see who could have the highest occupancy between them.  (Hutchinson depo, page 160; Walker depo, page 35).  Accordingly, the Plaintiff understood that she was allowed to consider an apartment occupied if the tenant put a security deposit down and promised to move in at a later date, even if no lease were actually signed at the time the security deposit is given.  (Hutchison depo, page 160).  Plaintiff gained this understanding from the Marketing Specialist and her District Managers.  (Hutchison depo, pages 160-161).  At the time of Plaintiff's audit, she learned that this particular practice was not acceptable.  Regardless of how Plaintiff came to this misunderstanding, the Plaintiff's conduct was motivated by what she believed to be

---

[5]

This actual practice gave no benefit to the tenant.  In fact, the tenant would be assuming responsibility for the period of November 10 through November 15 even though the tenant was not moving in until November 15.  (Walker depo, page 135).

acceptable company practice.  As Laurie Ward stated in her deposition:

> "I have heard – and I'm going to paraphrase.  Under that management [the District
> Manager Donna Girod] I have heard that you want to try to get people in and there is –
> there are – and you want occupancy numbers.  What can we do to get that resident to
> sign that lease you know.  You could try to get that resident to come in, you could give
> them the concession so that, for example, if you want the occupancy numbers, you get
> them in, even though they don't want to move in until August 15th, you want them to
> move in August 7th because you want them in there on that Tuesday, you know, before
> upload, and you'll do whatever it takes to have that happen. . . ."  (Ward depo, pages
> 199-200).

## C.       Financial audits of similarly situated employees.

A financial audit was conducted for the Dover Country Club on May 5, 2006 by Laurie Ward.

The Community Director for Dover Country Club was Tracey Lund who was promoted to Community

Director in February 1998.  In May 2006, Ms. Lund reported to Henry Walker who was her District

Manager.  (Plaintiff's Exhibit 3, page 1).  The May 5, 2006 audit was the second audit conducted at

Dover Country Club.  A full scope audit was conducted in March of 2003.  Ms. Lund was the

Community Director at the time of the first audit.  (Plaintiff's Exhibit 3, page 1).  The full scope audit

was found to be terrible due to noncompliance with policy and procedure.  (Ward depo, page 29).

The executive summary written by Laurie Ward concerning the May 5, 2006 audit was as follows:

> "This audit disclosed significant issues that warrant the immediate attention of
> management.  These issues include cash receipts, returned check practices,
> management of fee income and prepaid account balances, lease documentation
> regarding utility billing and special provisions, fair housing concerns, including adherence
> to credit/criminal screening and move-out practices.  Other less significant control,
> compliance, or improvement issues were identified that also require the prompt
> attention of management."  (Plaintiff's Exhibit 3, page 1).

No disciplinary action was levied against Ms. Lund as a result of this financial audit.  (Plaintiff's Exhibit

1, Answer No. 19; Plaintiff's Exhibit 4).  Rather, Mr. Walker gave Ms. Lund a write-up that consisted

9

of providing directives to her as to what needed to be done to correct the problem. (Plaintiff's Exhibit 11, pages 13-14). This write-up is in contrast to a written warning. (Plaintiff's Exhibit 11, page 14). Ms. Lund requested FMLA leave beginning May 8, 2006 due to a car accident which was ultimately approved. Mr. Walker met with Ms. Lund to discuss this write-up after the car accident when she came into work one day. (Plaintiff's Exhibit 11, page 14). Once Ms. Lund's FMLA leave expired, the Defendant notified her by way of a August 14, 2006 letter that her position was no longer guaranteed but that, once released to return to work, she should contact her manager to determine the availability of a position with the Defendant. (Plaintiff's Exhibit 4). Ms. Lund was not terminated until November 5, 2006 after her Short Term Disability benefits expired and she did not return to work. (Plaintiff's Exhibit 4; Plaintiff's Exhibit 11, page 12).

A financial audit was conducted by Laurie Ward for The Gatewater Landing Apartments in Glen Burnie, Maryland. The date of the audit is July 8, 2005. Allison Fenwick was the Community Director at the time of the audit. Henry Walker was the District Manager. (Plaintiff's Exhibit 5). The financial audit was conducted beginning in May of 2005 but was suspended due to audit resources needed elsewhere. Prior to the completion of the financial audit, Allison Fenwick left the company on June 10, 2005. The audit identified concerns as to cash management, NSF activity, expired leases and collections. (Plaintiff's Exhibit 5, page 1).

A financial audit was conducted at The Calverts Walk Apartments in Bel Air, Maryland during the period of February 21 through February 28, 2007. This audit was conducted by Laurie Ward. The Community Director involved was Joan Sluss. (Plaintiff's Exhibit 6, page 1). Laurie Ward's executive summary stated as follows:

"This audit disclosed significant issues related to banking, renewal leases, and move-out/collection practices that warrant the immediate attention of management.  Other less significant control, compliance, or improvement and training issues were identified that require management's attention."  (Plaintiff's Exhibit 6, page 1).

Joan Sluss was not disciplined or terminated as a result of these audit findings.  (Plaintiff's Exhibit 1, answer no. 19).

A financial audit was conducted at Tamar Meadow Apartments in Columbia, Maryland during the period of April 23 through May 21, 2007.  The Community Director was Nikki Thomas. (Plaintiff's Exhibit 7, page 1).  Laurie Ward stated the following in the executive summary:

"This audit disclosed significant issues related to lease documentation, fair housing concerns, including adherence to documented specials, application of late fees, and move-out/collections processing that warrant the immediate attention of management.  Other less significant control, compliance, or improvement and training issues were identified that require management's attention."  (Plaintiff's Exhibit 7, page 1).

Ms. Thomas was not disciplined or terminated as a result of these audit findings.  (Plaintiff's Exhibit 1, answer 19).

A financial audit was conducted by Laurie Ward on The Presidential Greens Apartments located in Alexandria, Virginia during the period of February 2 through 21, 2006.  The Community Director was Maribel Castellon.  (Plaintiff's Exhibit 8, page 1).  Laurie Ward wrote the following executive summary:

"This audit disclosed significant issues that warrant the prompt attention of management.  These issues include cash receipts, criminal screening procedures, adherence to document and move-in specials and move-out processes/charges.  Other less significant control, compliance, or improvement issues were identified that also require management attention."  (Plaintiff's Exhibit 8, page 2).

Ms. Castellon was not disciplined or terminated as a result of these audit findings.  (Plaintiff's Exhibit 1,

11

answer 19).

A financial audit was conducted by Laurie Ward at Dominion Waterside in Virginia Beach, Virginia on March 9 through 10, 2005.  The Community Director was Margie Davis.  (Plaintiff's Exhibit 9, page 1).  Laurie Ward's executive summary stated:

> "This audit disclosed significant issues that warrant the immediate attention of management.  Issues were discussed with the DM and AD prior to the completion of field work and issuance of this report.  These issues include but are not limited to: acceptance of large amounts of cash, misappropriation of resident funds, extensive inappropriate use of various write-off and concession codes, return checks never reversed out of resident accounts, gross property mismanagement.  The Community Director was terminated on March 17, 2005.  Additional review of this property will continue outside of this report.  Details of specific activity and findings will be provided to management and the Chief Risk Officer separate from this report."  (Plaintiff's Exhibit 9, page 1).

Ms. Davis was terminated on March 17, 2005 as a result of gross misconduct (criminal or violent activity).  (Plaintiff's Exhibit 10).  An additional review of the file following Ms. Davis' termination reflected that there was a potential loss in excess of $25,000.00.  (Plaintiff's Exhibit 9, bates no. 0306).

## IV.     LEGAL ANALYSIS/ARGUMENT - FMLA RETALIATION CLAIM.

### A.     Plaintiff's need for FMLA pregnancy leave was the determinative factor in the decision to terminate her from employment.  ("Pretext")

Plaintiff contends that the reason she was terminated from employment was because the Defendant did not want to have to deal with the inconveniences associated with her need for FMLA pregnancy leave, especially in light of the fact that Defendant believed that the Plaintiff was not going to return from the pregnancy leave, and thus seized upon the Plaintiff's audit results as an excuse to terminate her employment rather than issue a lesser disciplinary penalty and give the Plaintiff an opportunity to improve.  Plaintiff does not have "direct" evidence to support her claim of discrimination.

Accordingly, Plaintiff is proceeding under the well know burden-shifting scheme announced in

*McDonnell-Douglas/Burdine/Hicks/Reeves*.[6]   Under this scheme, the Plaintiff must first establish a

*prima facie* case of discrimination.  If such a *prima facie* case can be established, then the Defendant

must articulate a legitimate non-discriminatory reason for its decision.  The Defendant only has a burden

of production with respect to this articulation.  Once each of the parties satisfies these relatively modest

obligations, the case then proceeds to the ultimate question - whether the Plaintiff has proven that the

Defendant intentionally discriminated against him.  The Plaintiff has the ultimate burden of persuasion

with respect to this issue.  *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Texas Dept.*

*of Community Affairs v. Burdine,* 450 U.S. 248 (1981); *St. Mary's Honor Ctr. v. Hicks,* 113 S.

Ct. 2742 (1993); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).

   1.      *Prima Facie Case*.

   A *prima facie* case of disparate treatment discrimination is established where, by a

preponderance of the evidence, the Plaintiff has proven that the Defendant took an action impacting the

Plaintiff's employment under circumstances which give rise to an inference of unlawful discrimination.

*Burdine*, 450 U.S. 248, 253 (1981).  The *prima facie* case is not intended to be an onerous burden

on the Plaintiff.  *Dwyer v. Smith,* 867 F.2d 184, 190 (4th Cir. 1989).  To establish a *prima facie* case

of FMLA retaliation, an employee must show that she engaged in activity protected under the Act, that

she suffered an adverse employment action by the employer, and that a causal connection existed

---

[6]

   Both parties agree that this burden-shifting scheme is applicable to FMLA retaliation claims.

between the employee's action and the adverse employment action. *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002).

In the present case, there is no dispute that the Plaintiff satisfies these elements of the *prima facie* case. With respect to element one, the Plaintiff was pregnant, the Defendant knew that she was pregnant, there were discussions about the need for leave, and the Defendant knew that the Plaintiff would be requesting an FMLA pregnancy leave at the time she was ready for delivery. With respect to element number two, the Defendant terminated the employment, an action which clearly constitutes an adverse employment action. With respect to element number three, there is more than sufficient evidence to establish a causal connection between the Plaintiff's need for FMLA pregnancy leave and her termination from employment. The Plaintiff commenced employment on July 7, 2003 as a Community Director at Cross Court. In September/October of 2005, the Plaintiff learned that she was pregnant. Shortly thereafter, her management team learned of her pregnancy. Prior to this point in time, the Plaintiff had only received positive feedback concerning her performance and in fact had received merit increases in January of 2004, January of 2005, and January of 2006. In early 2006, Mr. Walker made repeated inquiries of the Plaintiff pertaining to her leave of absence for her pregnancy. The Plaintiff responded that she was due June 22, 2006. In a final conversation with Mr. Walker, which occurred shortly before her termination from employment, Mr. Walker commented to the Plaintiff that he had thought she was due in April and that he did not think she was going to return from her pregnancy leave. The Plaintiff thought, however, that Mr. Walker believed that she wasn't going to come back to work following her leave. Had the Plaintiff gone out on pregnancy leave, Mr. Walker would have had to find a temporary worker to fill in at the property so that the Assistant Community

14

Director who was working for the Plaintiff could assume some of the Plaintiff's responsibilities.  On

March 3, 2006, the Plaintiff was terminated from employment.  This decision was made by her

management team with final authorization from Human Resources.

In reviewing just these basic facts, one could certainly reach the conclusion that the Plaintiff was

terminated because of her need for pregnancy leave.  The shear timing of this decision to terminate the

Plaintiff, without considering yet any explanation by the Defendant, is more than sufficient to establish

the required causal connection necessary for a *prima facie* case.  *See Tinsley v. First Union*

*National Bank*, 155 F.3d 435, 443 (4th Cir. 1998) (very little evidence of a causal connection is

required to establish a *prima facie* case; timing alone can do so); *Allen v. Michigan Dept. of*

*Corrections*, 165 F.3d 405, 413 (6th Cir. 1999) (although no one factor is dispositive in establishing a

causal connection, evidence that the adverse action was taken shortly after the Plaintiff's exercise of

protected rights is relevant to causation); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179

(10th Cir. 1999) (causation can be inferred from timing alone where the adverse action occurred one

and one-half months after the protected conduct); *Parkins v. Civil Constructors of Illinois, Inc*., 163

F.3d 1027, 1039 (7th Cir. 1998) (a causal link is frequently established by showing that there was a

surprisingly short period of time between the employee's complaint and the adverse employment

action); *Bergstrom-EK v. Best Oil Co.*, 153 F.3d 851, 859 (8th Cir. 1998) (the element of causal

connection may be demonstrated indirectly by evidence that justifies an inference of retaliatory motive,

such as a showing that the employer has actual or imputed knowledge of the protected activity and the

adverse employment action follows closely in time);  *Quinn v. Greentree Credit Corp*., 159 F.3d

759, 769 (2nd Cir**.** 1998) (sufficient evidence to support a *prima facie* case where the discharge came

less than two months after the Plaintiff filed a complaint with management and ten days after the Plaintiff

filed with the Human Rights Agency); *Smith v. Riceland Foods, Inc*. 151 F.3d 813, 819-20 (8th Cir.

1998) (a sufficient causal connection was found where the employment action occurred three months

after the protected conduct); *McGarry v. Board of County Commissioners of Pitkin County*, 175

F.3d 1193, 1201 (10th Cir. 1999) (sufficient causal connection found where the Plaintiff was denied

consideration for a position which became vacant one month after the Plaintiff filed a charge of

discrimination).[7]

### 2.     Pretext/Discrimination.

In establishing the ultimate issue of discrimination, the plaintiff must prove, by a preponderance

of the evidence, that discrimination was the determinative factor in the decision to terminate her from

employment.  *Fuller v. Phipps,* 67 F.3d 1137, 1141 (4th Cir. 1995); *Lovelace v. Sherman-Williams*

*Co.,* 681 F.2d 230, 237 (4th Cir. 1992).  In evaluating whether or not the plaintiff can establish

discrimination, however, it is important to note that the rejection of the proffered reason given by the

defendant, coupled with the *prima facie* case, is sufficient in and of itself to allow a finding that

discrimination occurred.  *Reeves v. Sanderson Plumbing Products, Inc.,* 120 S. Ct. 2097, 2109

(2000); *St. Mary's Honor Ctr. v. Hicks,* 113 S. Ct. 2742 (1993); *Jiminez v. Mary Washington*

*College,* 57 F.3d 369, 378 (4th Cir. 1995).  This is based in part on the premise that, if the reason the

employer offers for the employment action is a lie, the inference that the real reason is a forbidden one

---

[7]
      The Defendant apparently is conceding that the Plaintiff has sufficient evidence to establish a
*prima facie* case of FMLA retaliation.  In its argument in favor of summary judgment on this claim, the
Defendant simply argues that the Plaintiff cannot establish that the proffered reason for the termination is
pretextual.

may rationally be drawn.  *Wallace v. SMC Pneumotics, Inc.,* 103 F.3d 1394, 1400 (7th Cir. 1997).

This is particularly important in the context of a Motion for Summary Judgment.  As stated in *Brewer v.*

*Quaker State Oil Refining Corp.,* 72 F.3d 326, 330-31 (3rd Cir. 1995), if the plaintiff has pointed to

evidence sufficient to discredit the defendant's proffered reason, the plaintiff need not also come

forward with additional evidence of discrimination beyond his/her *prima facie* case in order to survive

summary judgment.  *See also, Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir. 1995); *Ingels*

*v. Thiokol Corp.*, 42 F.3d 616, 621-22 (10th Cir. 1994).[8]

     In the present case, the Defendant contends that the Plaintiff was terminated solely because of

the results of her financial audit.  Plaintiff contends, however, that the comparative evidence belies the

Defendant's proffered reason.

     **(a)     Comparison with Tracey Lund.**

     Tracey Lund was the Community Director for Dover Country Club located in Dover,

Delaware.  Dover Country Club is in the same District as the Plaintiff's community and, at the time of

her financial audit, Henry Walker was her District Manager.  The audit report for Dover Country Club

was prepared on May 5, 2006.  In 2003, a full scope audit was performed for this property which

resulted in a number of areas of concern.  Ms. Lund was the Community Director at the time of this full

---

[8]

     In *Reeves,* the Court did state that there is a possibility that rejection of the defendant's
proffered reason coupled with a *prima facie* case may still be insufficient to allow the case to go to the
jury.  Such a finding could occur if the record conclusively reveals that the defendant gave the false
explanation to conceal something other than discrimination or if the plaintiff created only a weak issue of
fact as to whether the employer's reason was untrue and there was abundant and uncontroverted
evidence that no such discrimination had occurred.  However, as stated by Justice Ginsburg in her
concurring opinion, it is anticipated that such circumstances will be uncommon.  *Reeves,* 120 S. Ct. at
2112.  Plaintiff contends that, in the present case, no such special circumstances exist.

scope audit.  In fact, according to Louis Kovalsky in his e-mail of November 1, 2005 to Laurie Ward, Mr. Kovalsky stated with respect to Tracey Lund that " . . . she did terrible on the one two years ago and I would like to see what improvement she has made."  (See Defendant's Exhibit B, bates stamp no. 0021).

The May 5, 2006 audit, conducted by Laurie Ward, disclosed significant issues including cash receipts, return check practices, management of fee income and pre-paid account balances, lease documentation regarding utility billing and special provisions, fair housing concerns, including adherence to credit/criminal screening and move-out practices.  Notwithstanding the fact that the financial audit at Dover Country Club identified significant problems, as well as the fact that this was Ms. Lund's second unfavorable audit, absolutely no disciplinary action of any kind was taken against her.  Rather, Ms. Lund was simply issued a write-up which served as a counseling tool to provide directions as to what needed to be done to correct the problem.[9]

In comparing Tracey Lund and the Plaintiff, there are some critical similarities and distinctions. Both the Plaintiff and Ms. Lund were similarly situated in that each of them had a financial audit conducted in 2006 by the same auditor (Laurie Ward) and were both supervised by the same management team.  Both the Plaintiff and Tracey Lund were also similarly situated in that each of them had similar types of criticisms levied against them.  Finally, both the Plaintiff and Tracey Lund were similarly situated in that neither of them were found to have engaged in intentional/wilful misconduct;

---

[9]

Notwithstanding Ms. Lund's prior terrible audit, Mr. Walker concluded that a non-disciplinary write-up was the appropriate course of action to address the problems arising out of Ms. Lund's 2006 audit.

18

rather, each of them was simply found to have been in non-compliance with company policy and practice.[10]  As Henry Walker testified with respect to the Plaintiff:

> "I didn't look at the situation as to whether it was deliberate or not.  I looked at the fact that this was the policy.  The policy wasn't being adhered to. . . ."  (See Walker depo, page 131).[11]

Conversely, there are two major distinctions between the Plaintiff and Ms. Lund.  First, unlike Ms. Lund who had been a Community Director since 1998, the Plaintiff never had a prior audit of any kind, let alone a terrible prior audit.  And secondly, the Plaintiff was terminated from employment while no disciplinary action of any kind was taken against Ms. Lund.  To explain this difference, the Defendant argues that the Plaintiff's financial audit was worse than that at Dover Country Club because there were certain significant indications and findings in the Cross Court audit which were not specifically found in the Dover audit.  This argument misses the mark.  Even if Plaintiff's audit findings were found to be greater or more significant than those which were found with respect to Ms. Lund, the fact is that the Plaintiff was terminated from employment while absolutely no disciplinary action was taken against Ms. Lund.  Saying this another way, if Ms. Lund's audit findings were not even significant enough to warrant a written  disciplinary warning, taking into account that this was her second negative

---

[10]

    With respect to the four major concerns expressed by Mr. Walker concerning the Plaintiff's audit findings, the Plaintiff's behavior can probably be characterized at most as negligence in relying upon what other individuals, including her prior management, had told her and negligence in not properly supervising Ms. Flores.

[11]

    While the Defendant makes a reference in its Memorandum to the fact that the audit suggested there may have been some missing money and possible theft, no such conclusion was ever reached and clearly the Defendant did not terminate the Plaintiff based upon this "suspicion."

audit, then the Plaintiff's financial audit results certainly could not have warranted discharge.  Clearly, given the lack of discipline to Ms. Lund, the decision to terminate the Plaintiff is completely out of proportion and, accordingly, had to have been motivated by something else.[12]

       **(b)        Comparison to other relevant audits.**

       Besides the audit of Dover Country Club, there were five other financial audits conducted by Laurie Ward during this same general period of time, within the same basic geographic area as the Plaintiff, and involving Community Directors who reported to one or more of the same management team as did the Plaintiff.  In all of these cases, as outlined in the statement of material facts, there were various findings of non-compliance.  Yet, unlike the Plaintiff, and with the exception of Margie Davis, none of the Community Directors were formerly counseled or terminated. Again, as is the case concerning Tracey Lund, it may very well be that the Plaintiff's audit findings were more significant than the audit findings of Alison Fenwick, Joan Sluss, Nikki Thomas, or Maribel Castellon.  However, given their relative degree of non-compliance, if termination were justified because of the Plaintiff's audit findings, one would still have expected that at least some of these other Community Directors would receive some form of disciplinary action.  The fact that these individuals were not disciplined in any manner is inconsistent with the Defendant's position that the Plaintiff's audit results warranted

---

12

       What doesn't make sense is why the Defendant did not give the Plaintiff an opportunity to improve after this initial audit.  Given that the Plaintiff's noncompliance was primarily the result of her operating on incorrect information, the Plaintiff certainly could have corrected her behavior now that she was in possession of the appropriate methodologies.  Furthermore, while not an excuse for her lack of compliance, there were no negative ramifications which flowed from her noncompliance.  This question begs an answer, especially given the number of chances which the Defendant was affording Ms. Lund.

termination.[13]

Margie Davis, the Community Director for the Dominion Waterside at Lynnhaven Apartments, was in fact terminated as a result of her audit findings.  However, Ms. Davis was found to have accepted large amounts of cash and misappropriated resident funds.  Obviously, Ms. Davis' criminal conduct constitutes a far more serious offense than any of the findings concerning the Plaintiff.  As such, the fact that Ms. Davis was terminated as a result of her audit findings does not suggest in any manner that the Plaintiff's termination was also warranted.[14]

In summary, the Defendant's articulated reason for why the Plaintiff was terminated, i.e., due to findings from her financial audit, is simply not supported by comparing the Plaintiff's performance with other similarly situated individuals.  Accordingly, a reasonable jury could well conclude that "something else" motivated the Defendant to terminate the Plaintiff's employment.  In conjunction with Plaintiff's *prima facie case*, a reasonable jury could well conclude that the determinative factor was the Plaintiff's

[13]

The Defendant continually makes reference to the fact that Laurie Ward concluded that the Plaintiff's audit ranked among the top 25 percent of the worst audits she ever conducted at UDR.  However, Ms. Ward admitted that, if you take away those audits where embezzlement/fraud/theft were found, there were other audits within the same category of severity as the Plaintiff's audit.  (Ward depo, page 138-139).  Out of the audits conducted by Laurie Ward, only Margie Davis was ever terminated and her termination is discussed below.  (Plaintiff's Exhibit 1, answer 19).  This would mean that none of the other individuals who had audits in the same category of severity as the Plaintiff were either terminated or disciplined.

[14]

The Defendant listed "job performance" as the reason for terminating the Plaintiff  (Plaintiff's Exhibit 2) but listed "gross misconduct (criminal or violent activity)" as the reason for terminating Ms. Davis.  (Plaintiff's Exhibit 10).

pregnancy and/her need for FMLA pregnancy leave.  As declared in *Che v. Massachusetts Bay Transp. Authority,* 342 F.3d 31, 39-40 (1st Cir. 2003):

> "We are mindful that there is no 'mechanical formula' for finding pretext.  It is the type of inquiry where 'everything depends on the individual facts.'  As such, we have been 'particularly cautious' about taking such questions out of the jury's hands."[15]

As such, there is sufficient evidence to deny Defendant's Motion for Summary Judgment on Plaintiff's FMLA retaliation claim.

**B.    Plaintiff's need for FMLA pregnancy leave was a motivating factor in the decision to terminate her from employment.  ("Mixed Motive")**

Alternatively, Plaintiff contends that she has sufficient evidence to establish that her need for FMLA pregnancy leave ("protected status") was a motivating factor in the decision to terminate her from employment.  In order to establish a "mixed motive" claim, the Plaintiff must first show that her protected status played a motivating part in the employment decision.  Once this is established, the Defendant has the burden to prove that it would have made the same decision despite the improper motive.  *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S. Ct. 1775 (1989).[16]  In order to establish that the protected status is a motivating factor in the adverse decision, the Plaintiff may utilize both direct and circumstantial evidence.  *Desert Palace, Inc. v. Costa,* 539 U.S. 90 (2003).

As discussed in Section A, there is ample evidence to suggest that the Plaintiff's protected

---

[15]

The Court found evidence of disparate treatment based upon evidence that other employees who engaged in similar conduct as the Plaintiff were not disciplined while the Plaintiff was subject to a demotion.

[16]

Plaintiff contends that the "mixed motive" theory is applicable to FMLA retaliation claims.  *See Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327 334 (5th Cir. 2005).

status was a factor in the termination decision.  Mr. Walker stated to the Plaintiff that he did not think

that she was going to return from her pregnancy leave.    Shortly thereafter, the Plaintiff was terminated

from employment.  Furthermore, in comparing the Plaintiff's audit results with others who were similarly

situated, she was treated far more severely than any other employee (except those who were found to

have engaged in embezzlement or theft).  The only apparent distinction between the Plaintiff and these

other similarly situated employees is that the Plaintiff was pregnant and going to take a FMLA

pregnancy leave in the not-to-distant future.  Accordingly, based upon these facts, a jury could

reasonably conclude that Plaintiff's need for FMLA pregnancy leave was at least a factor in the

decision to terminate her employment.

   In order for the Defendant to prevail once it has been determined that the protected status was

a motivating factor in the decision, the Defendant must establish that it would have taken the same

action anyway even had the protected status not been considered.  In the context of the present

Motion, the Defendant must prove, as a matter of law, that it would have taken the same action even

had the Plaintiff's protected status not been considered.  This the Defendant cannot do for all of the

same reasons outlined above with respect to the comparative evidence.  Very simply, there is no basis

to conclude that, as a matter of law, the Plaintiff would have been terminated from employment even

had her protected status not been considered when there is no logical explanation for why the Plaintiff

was terminated while similarly situated Community Directors who also had unfavorable audits were not

disciplined in any manner.

**V.**   **LEGAL ANALYSIS/ARGUMENT- TITLE VII PREGNANCY DISCRIMINATION.**

**A.**   **Plaintiff's pregnancy status was the determinative factor in the decision to terminate**

**her from employment.  ("Pretext")**

Plaintiff contends that the reason she was terminated from employment was because the Defendant did not want to have to deal with the inconveniences associated with her pregnancy (including her need for pregnancy leave), especially in light of the fact that Defendant believed that the Plaintiff was not going to return from the pregnancy leave, and thus seized upon the Plaintiff's audit results as an excuse to terminate her employment rather than issue a lesser disciplinary penalty and give the Plaintiff an opportunity to improve.[17]  As with the FMLA retaliation claim, Plaintiff does not have "direct" evidence to support this claim of discrimination and, accordingly, Plaintiff will proceed under the *McDonnell-Douglas/Burdine/Hicks/Reeves* burden-shifting scheme.

On page 9 of its Memorandum, the Defendant has set forth the standard method for establishing a *prima facie* case of discriminatory termination.  There is clearly no dispute that Plaintiff meets elements (1), (2), and (4) in that she was pregnant, the Defendant knew about her pregnancy, she was terminated from employment, and the position was filled by an individual who was not pregnant.  The Defendant argues, however, that at the time the termination decision was made, the Plaintiff was not performing her job at a level that met its legitimate expectations.  In support of this contention, the Defendant cites the deficiencies which were discovered during Plaintiff's financial audit. For the following two reasons, Plaintiff disagrees with the Defendant's argument that the Plaintiff cannot establish the third element of the *prima facie* case.  First of all, in determining whether or not an

---

[17]
This claim is completely intertwined with the FMLA retaliation claim and these claims are really nothing more than mirror images of each other.  However, because these claims arise under separate statutes, the damage schemes are different and, accordingly, it is appropriate for there to be separate findings under each statutory claim.

24

individual meets the employer's legitimate expectations, a court may not consider the employer's

alleged non-discriminatory reason for taking an adverse action when analyzing the *prima facie* case as

to do so would by-pass the burden-shifting analysis and deprive the Plaintiff of the opportunity to show

that the non-discriminatory reason was in actuality a pretext designed to mask discrimination.  *Wexler*

*v. Whites Fine Furniture, Inc.,* 317 F.3d 564, 574 (6th Cir. 2003).  In the present case, this is exactly

what the Defendant is trying to do as the Defendant's articulated reason for why it has terminated the

Plaintiff is due to the deficiencies identified in the financial audit.  Secondly, there is sufficient evidence

that the Plaintiff was meeting the employer's legitimate expectations.  Prior to her audit, the Plaintiff

received regular salary increases and positive feedback concerning her employment.  *See Bass v. E.I.*

*DuPont de Nemours & Co.,* 324 F.3d 761, 766 n.1 (4th Cir. 2003) (sufficient evidence was found to

establish a *prima facie* case where the employee had been promoted, received pay increases, and

been told that her performance was satisfactory).  Accordingly, there is sufficient evidence to establish

Plaintiff's *prima facie* case of pregnancy discrimination.[18]

Plaintiff also contends that there is sufficient evidence to cast doubt on the Defendant's

articulated reason for terminating her employment.  This is the exact same evidence which has already

been presented in Section IV(A)(2).  Thus, in conjunction with the *prima facie* case, there is sufficient

evidence to establish that the Plaintiff's pregnancy status, either alone or in combination with her need

for FMLA pregnancy leave, was the determinative factor in the decision to terminate her employment.

---

[18]

Alternatively, the Plaintiff can establish a *prima facie* case pursuant to the time line in which the
termination closely followed the Defendant's knowledge of Plaintiff's pregnancy status as well as by
comparing the Plaintiff's situation with similarly situated employees.

25

**B.      Plaintiff's pregnancy status was a motivating factor in the decision to terminate her from employment.  ("Mixed Motive")**

Alternatively, Plaintiff contends that her pregnancy status was at least a motivating factor in the decision to terminate her from employment.

The statutory language of Title VII clearly provides for liability against the employer where the protected status is a motivating factor for any employment practice, even though other factors also motivated the practice.  42 U.S.C. § 2000 e-2 (m).  For all of the reasons cited in Section IV(B), there is sufficient evidence to establish that Plaintiff's pregnancy status (including her need for pregnancy leave) was a motivating factor in the decision to terminate her from employment.  Thus, there is sufficient evidence to go to a jury on a "mixed motive" theory and Defendant's Motion for Summary Judgment must therefore be denied.[19]

**VI.      CONCLUSION.**

Pursuant to the preceding, it is clear that there is more than sufficient evidence to support Plaintiff's *prima facie* case of discrimination based upon pregnancy status and/or need for FMLA pregnancy leave.  In addition, there is sufficient evidence to cast substantial doubt on the articulated reason proffered by the Defendant as to why the Plaintiff was terminated from employment.  Taken together, this creates a sufficient controversy to allow the case to go to a jury.  Accordingly, Defendant's Motion for Summary Judgment must be denied.

---

[19]

Title VII makes it clear that, if there is a finding that the protected status was a motivating factor, liability will be found against the employer; the employer's proof that it would have taken the same action anyway does not serve as a complete defense to liability but only to limit damages.  *See* 42 U.S.C. §2000 e-5(g)(2)(B).

Alternatively, there is sufficient evidence to establish that the Plaintiff's pregnancy status and/or need for FMLA pregnancy leave was at least a motivating factor in the decision to terminate the Plaintiff from employment.  Furthermore, the Defendant cannot establish, as a matter of law, that the Plaintiff would have been terminated anyway even if considerations were given to her pregnancy status and/or need for FMLA pregnancy leave.  Accordingly, Plaintiff has created an issue of fact with respect to her mixed motive theory and, thus, the Defendant's Motion for Summary Judgment must be denied.

Respectfully submitted,

*Mitchell I. Batt*
Mitchell I. Batt, Fed Bar No. 12002
Sullivan, Talbott & Batt
77 S. Washington Street
Suite 304
Rockville, MD 20850
(301) 340-2450
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a copy of the foregoing Memorandum of Law was filed electronically and served electronically on counsel, this 3rd day of March, 2008 to:

Paul J. Kennedy, Esquire
Littler Mendelson, P.C.
1150 17th Street, N.W.
Suite 900
Washington, D.C.  20036

Juan C. Lopez-Campillo, Esquire
Littler Mendelson, P.C.
4767 New Broad Street
Orlando, FL 32814

*/s/ Mitchell I. Batt*
Mitchell I. Batt